**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF TEXAS
DALLAS DIVISION**

| | | |
|---|---|---|
| **KAREN SKIDIS,** | § | |
| | § | |
| **Plaintiff** | § | |
| | § | |
| **v.** | § | **Civil Action No. 3:08-CV-2181-N (BH)** |
| | § | |
| **COMMISSIONER OF SOCIAL** | § | |
| **SECURITY ADMINISTRATION,** | § | |
| | § | |
| **Defendant.** | § | |

**FINDINGS, CONCLUSIONS, AND RECOMMENDATION
OF THE UNITED STATES MAGISTRATE JUDGE**

Pursuant to *Special Order No. 3-251*, this case was automatically referred to the undersigned United States Magistrate Judge for proposed findings of fact and recommendation for disposition. Before the Court are *Plaintiff's Motion for Summary Judgment* ("Pl. Mot."), filed June 1, 2009; and *Commissioner's Motion for Summary Judgment* ("Def. Mot."), filed June 23, 2009. The Plaintiff did not file a reply. Based on the evidence, filings and applicable law, *Plaintiff's Motion for Summary Judgment* should be **GRANTED,** *Commissioner's Cross-Motion for Summary Judgment* should be **DENIED**, the final decision of the Commissioner should be **REVERSED** and the case **REMANDED** for further proceedings.

**I. BACKGROUND**[1]

**A.     Procedural History**

Karen Skidis ("Plaintiff") seeks judicial review of a final decision by the Commissioner of Social Security ("Commissioner") denying her claim for disability benefits under Title II of the

---

[1] The following background comes from the transcript of the administrative proceedings, which is designated as "Tr."

Social Security Act.  On November 23, 2005, Plaintiff filed an application for disability benefits. (Tr. at 24, 133.)  Plaintiff claimed she was disabled on August 1, 2003, due to bilateral carpal tunnel syndrome, bilateral cubital tunnel syndrome, chronic pain syndrome, fibromyalgia, degenerative disc and joint disease, osteoarthritis in the knees, osteoporosis, hemangiomas, depression and anxiety, polycythemia vera, and hypothyroidism. (Tr. at 144-45.) Plaintiff's application was initially denied on January 19, 2006 and upon reconsideration on March 9, 2006.  (Tr. at 70, 65.)  Plaintiff timely requested a hearing before an Administrative Law Judge ("ALJ") on April 7, 2006.  (Tr. at 64.) Plaintiff failed to appear at the first scheduled hearing on January 10, 2007.  (Tr. at 56.)  On January 12, 2007, the ALJ issued an order dismissing Plaintiff's request for hearing for failure to appear. *Id.*  On May 22, 2007, the Appeals Council found good cause for the failure to appear and granted Plaintiff's request for review, vacated the ALJ's dismissal, and granted another hearing.  (Tr. at 62-63.) Plaintiff personally appeared and testified at the second hearing held on November 8, 2007. (Tr. at 474-505.)  On December 27, 2007, the ALJ issued his decision finding Plaintiff not disabled. (Tr. at 24-33.)   On June 7, 2008, the Appeals Council denied Plaintiff's request for review, concluding that the contentions raised in Plaintiff's request for review did not provide a basis for changing the ALJ's decision.  (Tr. at 10.)  The ALJ's decision became the final decision of the Commissioner.  *Id.*  Plaintiff timely appealed the Commissioner's decision to the United States District Court pursuant to 42 U.S.C. § 405(g) on December 10, 2008.

**B.**     **Factual History**

    **1.     Age, Education, and Work Experience**

    Plaintiff was born in 1947. (Tr. at 52.)  At the time of the hearing before the ALJ, she was 60 years old.  (Tr. at 476.)  Plaintiff had graduated high school and received special job training at

- 2 -

the American Airlines Travel Academy.  (Tr. at 150.)  Her past relevant work included work as a

hotel database analyst, courier, and apartment manager. (Tr. at 135).  Plaintiff last worked in August

2003.  (Tr. at 145.)

### 2.    Medical Evidence

Plaintiff's relevant medical history began on May 20, 2002, when Plaintiff was referred to

Dr. James P. Loftin, M.D., at Dallas Pulmonary Associates for complaints of ongoing daytime

fatigue, irritability, depression, dry mouth, and headaches upon awakening at least three times a

week.  (Tr. at 304.)  Dr. Loftin opined that Plaintiff's symptoms were possibly due to a sleep

disorder such as sleep apnea or periodic leg movements.  (Tr. at 306.)  Dr. Loftin recommended a

nocturnal polysomnogram to evaluate her sleep pattern.  *Id.*

On June 2, 2002, Plaintiff received a nocturnal polysomnogram at the American Sleep

Diagnostic Corporation.  (Tr. at 175.)  The examination results determined that Plaintiff had poor

sleep quality with a high percentage of  "wake" sleep and low percentage of REM sleep.  (Tr. at

177.)  Plaintiff was diagnosed as possibly having periodic limb movement syndrome.  *Id.*  Based

upon this examination, Dr. Loftin recommended that she lose weight and that she consider an oral

device to help her mild respiratory disturbances.  *Id.*

On August 15, 2002, Plaintiff underwent another series of tests at the American Sleep

Diagnostic Corporation to determine the cause of her daytime hypersomnolence.  (Tr. at 162.)  As

a result of the test results, Dr. Loftin diagnosed Plaintiff with periodic limb movement syndrome.

(Tr. at 164.)  Dr. Loftin advised Plaintiff to take either Klonopin, Sinemet, or Peroglide.  *Id.*  He

again recommended that she lose weight and possibly acquire an oral dental device for her mild

respiratory disturbances.  *Id.*

On December 6, 2002, Plaintiff saw Dr. Charles Wallace, M.D., for complaints of pain in both wrists. (Tr. at 214.) She informed Dr. Wallace that she had undergone some therapy, taken Celebrex, and done splinting in order to mitigate an injury she suffered in August 2002. *Id.* Dr. Wallace scheduled an EMG to determine the cause of her pain and referred her to Dr. Frank Morrison, M.D. *Id.* On December 18, 2002 Plaintiff informed Dr. Morrison that she was experiencing upper extremity pain, numbness and weakness, and radiating pain from her wrists. (Tr. at 192.) She also reported that taking Celebrex and Hydrocodone afforded her only moderate relief. (Tr. at 193.) Dr. Morrison administered and analyzed an EMG, whose abnormal findings were noted to be consistent with carpal tunnel syndrome and cubital tunnel syndrome. (Tr. at 192, 194.)

On January 7, 2003, Plaintiff returned to Dr. Wallace to discuss the results of the EMG. (Tr. at 214.) Dr. Wallace diagnosed Plaintiff with bilateral carpal tunnel syndrome and recommended that she undergo surgery to resolve her complaints. *Id.* Plaintiff underwent a right carpal tunnel release ("CTR") and ulnar nerve release on January 16, 2003. *Id.* On January 21, 2003, Plaintiff contacted Dr. Wallace to request that her post-operation examination be moved up one day earlier in order to accommodate the "panic attacks" she had been experiencing. (Tr. at 214.) On January 23, 2003, Plaintiff contacted Dr. Wallace to complain that the prescribed Darvocet medication was making her drowsy and sluggish in the mornings, and that she would like to replace it with Hydrocodone, which did not have this effect on her. (Tr. at 213.) Dr. Wallace changed Plaintiff's prescription from Darvocet to Hydrocodone. *Id.*

On January 31, 2003, Dr. Wallace reported that Plaintiff's recovery was going well and scheduled surgery to be done on her left side. *Id.* On March 12, 2003, Plaintiff underwent surgery to her left side to release the left carpal tunnel and ulnar nerve transposition. *Id.* Dr. Wallace opined

that Plaintiff was "doing well" during several post-operation calls and visits in March and April of 2003. *Id.* On May 13, 2003, Dr. Wallace reported Plaintiff to still be in considerable discomfort on her left side. *Id.* On June 3, 2003, Dr. Wallace suggested that Plaintiff undergo strength training to improve the use of her extremities. (Tr. at 212.) He warned her that if she returned to work in high speed data entry, there would be a high probability that her carpal tunnel and associated symptoms would reoccur. *Id.* On July 15, 2003, Dr. Wallace released Plaintiff to work 4 hours with a 15 minute break. (Tr. at 212.)

On August 7, 2003, Plaintiff went to Dr. James S. Rellas, M.D., with complaints of shortness of breath with minimal exertion, arm pain, nocturnal heartburn, restless leg syndrome, and symptoms of chronic fatigue syndrome. (Tr. at 395.) Results of an echocardiogram revealed that Plaintiff suffered from rheumatic heart disease with thickened mitral valve and mild mitral regurgitation necessitating antibiotic prophylaxis. (Tr. at 399.)

On August 12, 2003, Dr. Wallace noticed Plaintiff's carpal tunnel symptoms had returned upon her return to work. (Tr. at 212.) He scheduled an additional EMG to document the problem. *Id.* The results of the EMG indicated that Plaintiff's carpal tunnel and ulnar nerve areas were "doing nicely." *Id.* He also noted that she had a C-7 radiculopathy which could have resulted from her worker's compensation injury. *Id.* He scheduled an MRI in order to determine the extent. *Id.*

A Texas Workers' Compensation Commission (TWCC) report dated October 7, 2003 noted that Plaintiff had a past history of depression, hypothyroidism, hypertension and mitral valve prolapse. (Tr. at 201.) On October 21, 2003, Plaintiff returned to Dr. Wallace with generalized complaints of pain throughout her upper extremities radiating from her neck. (Tr. at 211.) Dr. Wallace reiterated the need for an MRI and suggested that Plaintiff consult the Chronic Pain Clinic

in order to determine if her problems were due to chronic pain, neck pain or a combination. *Id.* The MRI revealed that Plaintiff had a 3 mm disk osteophyte complex at C5-C6, with impingement to the left side and mild central stenosis in addition to a mild 2mm disk bulge at L4-L5 with no significant neural compression. (Tr. at 317.)

On March 18, 2004, Plaintiff saw Dr. Leyka M. Barbosa, M.D., with complaints of full body pain. (Tr. at 317-20.) She complained that her pain was so severe that she relied on Hydrocodone to complete her daily activities. *Id.* Plaintiff expressed that the Klonopin and Sinement had improved her symptoms of sleeplessness to some extent. *Id.* Dr. Barbosa found that Plaintiff had a history of depression and was taking Prozac and Wellbutrin at the time of the examination to mitigate her symptoms. (Tr. at 318.) During this examination, Plaintiff denied feelings of anxiety, depression, increased worries, agitation, irritability, or mood swings. *Id.* Dr. Barbosa diagnosed Plaintiff with fibromyalgia syndrome, carpal tunnel syndrome, cubital tunnel syndrome, degenerative disc and joint disease of the cervical spine at C5-C6, low back pain for which stretching and weight loss was prescribed, osteoarthritis in the knees, and osteoporosis. (Tr. at 320.) Dr. Barbosa did not prescribe any further treatment for Plaintiff's depression, anxiety and hypothyroidism, all of which were noted to be "on therapy." *Id.*

On September 16, 2004, Dr. James D. Zodrow, M.D., diagnosed Plaintiff with chronic pain in the arms, depression, osteoporosis, and other conditions. (Tr. at 247.) Dr. Zodrow prescribed Prozac and Wellbutrin for her depression and anxiety. *Id.* November 2004 x-rays of Plaintiff's lumbosacral spine revealed minimal anterior spondylosis. (Tr. at 323.) On February 18, 2005, Dr. Zodrow noted Plaintiff's continued disability, chronic pain syndrome, and fibromyalgia. (Tr. at 243.) Dr. Zodrow increased Plaintiff's dosage of Vicodin and noted that her depression impaired

her work capacity, and that her physical problems were such that she could not lift, write, or hold a phone.  (Tr. at 243-44.)  He opined that Plaintiff was permanently disabled because she could not complete even one hour of sedentary activity.[2]  (Tr. at 244, 246.)

On February 22, 2005, Dr. Barbosa opined that Plaintiff could occasionally carry 1-10 lbs., with simple grasping and medium dexterity, and that she would be able to complete four hours of sedentary activity.  (Tr. at 93-94.)  On April 26, 2005, Plaintiff saw Dr. Steven Remer, M.D., to have intra-articular steroid injections for her spondylosis of the lumbar spine.  (Tr. at 250-56.)  On January 13, 2006, Dr. Walter examined Plaintiff and diagnosed her with bilateral carpal tunnel syndrome in addition to low back and neck pain.  (Tr. at 330.)  Dr. Walter opined that Plaintiff's RFC allowed her to occasionally lift 20 lbs.; frequently lift 10 lbs.; stand and walk 6 hours out of a normal 8 hour workday; sit for a total of 6 hours in an 8-hour workday; push and pull; climb stairs; and occasionally kneel, crouch and crawl.  (Tr. at 331-34.)

On November 6, 2007, Dr. Barbosa completed a "Medical Assessment of Ability To Do Work-Related Activities" physical in which she opined that Plaintiff's ability to lift, carry, stand, walk, and sit were impaired by her various physical impairments.  (Tr. at 468-69.)  Dr. Barbosa opined that Plaintiff could stand for 1-2 hours with frequent rests, stand uninterrupted for less than 30 minutes, and sit for 2-3 hours with stretches.  *Id.*  During several examinations in 2007, Dr. Barbosa noted that Plaintiff's symptoms of depression and anxiety had worsened; she had suffered "crying spells;" her depression was a "major problem;" and she was "more anxious."  (Tr. at 451-53.)

On February 20, 2008, Plaintiff notified Dr. Barbosa that she "fe[lt] better overall."  (Tr. at

---

[2] Sedentary activity as denoted on the Unum Provident Claimant's Supplemental Statement Form is defined as: "10 lbs. maximum lifting or carrying articles; walking/standing on occasion; sitting 8/8 hours." (Tr. at 246).

473.)  Dr. Barbosa noted that Plaintiff's chronic low back pain, carpal tunnel syndrome, osteoarthritis, hypothyroidism, and restless leg syndrome were all stable.  *Id.*  She also noted that Plaintiff's depression and anxiety were stable because of taking Cymbalta.  *Id.*

### 3.    Hearing Testimony

A hearing was held before the ALJ on November 8, 2007.  (Tr. at 474.)  Plaintiff appeared personally and was represented by an attorney. *Id.*

a.    <u>Plaintiff's testimony</u>

Plaintiff testified that the chronic pain in her back, sacral area, wrists and hands, neck and shoulders, and muscles had prevented her from working since August 1, 2003.  (Tr. at 479, 487.)  The pain was constant, of varying degrees, migrated from her neck to her arms, and increased in cold, rainy weather.  (Tr. at 479.)  Plaintiff had surgery on the right and left hands and elbows to relieve her carpal tunnel and cubital tunnel syndromes.  *Id.*  After the surgeries, she still experienced pain in her hands and wrists, and lived with a pain level of seven on a daily basis.  (Tr. at 479-480.)  Plaintiff took four Vicodin daily for her pain, and a Klonopin, Sinemet, and Soma every night to sleep.  (Tr. at 480.)  The medication caused her to feel groggy and sleepy.  *Id.*

Concerning her daily activities, Plaintiff testified that she spent 6 hours of her day lying down on the couch or the bed, depending on her pain level.  (Tr. at 480-81.)  Plaintiff testified that she was able to lift a gallon of milk with one hand and pour it with both hands.  (Tr. at 481.)  She could lift up to 10 pounds with two hands.  *Id.*  Because of difficulty in grasping things, she wore clothing with elastic bands and slip-on shoes.  (Tr. at 482.)  Some days she had difficulty buttoning her clothes due to barometric pressure changes.  *Id.*  Plaintiff could write and type comfortably for 30 minutes.  (Tr. at 483.)  Plaintiff had difficulty sitting, bending, and standing for longer than 15

- 8 -

minutes due to low back and sacrum pain, and was not able to kneel due to joint pain in her knees. (Tr. at 484- 85.)  She could prepare her own meals once or twice a week but relied on her mother to dust and vacuum for her.  (Tr. at 485- 86.)  Plaintiff was able to go grocery shopping on her own about three times a week and could bag groceries, but could only carry light grocery bags up the stairs.  (Tr. at 485-86.)  She left the rest of the bags in the car until somebody came over to help with those bags. (Tr. at 483, 486.)  Because of her sleep apnea and restless leg syndrome, she needed medication in order to sleep.  (Tr. at 485).

     b.    <u>Medical Expert Testimony</u>

A medical expert ("ME") also testified at the hearing.  (Tr. at 489.)  The ME testified that Plaintiff had fibromyalgia but that her medical record did not note any major problems with her medication for fibromyalgia.  (Tr. at 490- 91.)  He also noted that Plaintiff's carpal tunnel syndrome and ulnar nerve entrapment had been resolved with surgery, and that she had no recurrence of carpal tunnel symptoms.  (Tr. at 491.)  The neck pain Plaintiff described was not typical of neck pain problems with radiation to the hands.  *Id.*  Even though the results of Plaintiff's MRI did not show any neurological abnormalities or impairments of the upper extremities, they did show mild loss of disk height, disk protrusion, mild compressions of the lateral aspects of the cord surface, slight neural foraminal narrowing, and potential compression of the C6.  (Tr. at 492.)  An x-ray of Plaintiff's lower back showed some spondylosis to a mild degree but there were no neurological abnormalities in the back.  *Id.*  The ME noted that even though Plaintiff's x-rays of her knees were normal, Plaintiff had been diagnosed with osteoarthritis.  *Id.*  The ME opined that the mild early degenerative changes in her knees were more typical of fibromyalgia than of degenerative arthritis, and that the periodic leg movement difficulties related to her sleep were also attributable to

fibromyalgia.  *Id.*

The ME testified that Plaintiff's fibromyalgia, in addition to her generalized pain, was the limiting factor in her inability to work.  (Tr. at 493.)  He concluded that the medication she was taking could produce excessive drowsiness during the day but did not find support for its limitation in the record.  *Id.*  Based on the record, the ME suggested that the ALJ use 14.09-A of the medical listing.[4]  *Id.*  As to limitations, the ME testified that Plaintiff should have the ability to lift a maximum of 10 pounds, less than 10 pounds frequently; stand and walk for two to four hours out of eight; and sit for six hours out of eight.  *Id.*  He further testified that Plaintiff should have the ability to change positions every 30 minutes to mitigate the pain factor.  *Id.*  Finally, the ME testified that Plaintiff could engage in postural activities occasionally and non-constant manipulation frequently, and that she would need to be limited to indoor work.  (Tr. at 493-94.)

c.      Vocational Expert Testimony

A vocational expert ("VE") also testified at the hearing.  (Tr. at 499.)  The VE testified that Plaintiff had previously worked as a data entry clerk (sedentary, semiskilled, SVP 4, DOT # 203.582-054); a courier (light, semiskilled, SVP 3, DOT # 230.667-010); and apartment manager (sedentary, skilled, SVP 7, DOT # 169.167-034).  (Tr. at 499- 500.)  The ALJ asked the VE to consider a hypothetical person who could occasionally lift 20 pounds and frequently lift 10 pounds; could pull 20 pounds; could sit, stand or walk for six hours; could occasionally kneel, crouch and crawl; could not climb ropes, ladders or scaffolds; and had to avoid concentrated exposure to hazards, machinery and heights.  (Tr. at 501-502.)  Based on this residual functional capacity ("RFC"), the VE testified that such a person would be able to perform the work of a data-entry clerk,

---

[4]The ME testified that the 14.09-A listing for rheumatoid arthritis is commonly used for fibromyalgia because the limitations from pain for each are very similar. (Tr. at 493.)

apartment manager, and courier.  (Tr. at 501-02.)  When asked to respond to the hypothetical based

on the ME's restriction of Plaintiff to less than full sedentary positions with avoidance of constant

fingering or manipulation, the VE testified that Plaintiff could perform apartment manager work,

but not data-entry.  (Tr. at 502-03.)  When asked to respond to a hypothetical based on Plaintiff's

treating physician's reports limiting Plaintiff to less than eight hours of work a day, the VE testified

that such limitation would preclude Plaintiff from participating in competitive employment.  (Tr. at

503-04.)

## C.  ALJ's Findings

The ALJ denied Plaintiff's application for benefits by written opinion issued on December

27, 2007.  (Tr. at 33.)  The ALJ found that Plaintiff had met the insured status requirements of the

Social Security Act through December 31, 2008, and that she had not engaged in substantial gainful

activity since August 1, 2003, the alleged disability onset date.  (Tr. at 26, ¶1,2.)  The ALJ also

found that Plaintiff had the following severe impairments: fibromyalgia, bilateral carpal tunnel

syndrome status post surgery, and degenerative disc disease of the cervical spine and lumbar spine.

(Tr. at 27, ¶3.)  However, the ALJ concluded that Plaintiff's impairment or combination of

impairments did not meet or equal a listed impairment listed in 20 C.F.R. § Part 404, Subpart P,

Appendix 1.  (Tr. at 29, ¶4.)  The ALJ found that although fibromyalgia is not a specifically listed

impairment, individuals with impairments that fulfill the American College of Rheumatology criteria

for fibromyalgia may fulfill the criteria for chronic fatigue syndrome.  *Id.* at ¶ 4.  The ALJ further

noted that individuals with fibromyalgia may exhibit medical signs of anxiety and depression that

would indicate a mental disorder, and that when these medical signs are present and appropriately

documented, the existence of a medically determinable impairment is established.  *Id.*  The ALJ

noted that though Plaintiff could likely be depressed and anxious, there was no record of treatment for the anxiety and depression by a mental health professional.  (Tr. at 30, ¶1.)

The ALJ concluded that Plaintiff retained the RFC to perform the exertional and non-exertional requirements of a full range of sedentary work reduced by the requirement of a sit or stand option in 30 minute intervals; no frequent manipulation with the upper extremities; only occasional climbing, balancing, stooping, kneeling, crouching and crawling; no climbing ropes, ladders or scaffolds; and a temperature-controlled environment.  (Tr. at 30, ¶3.)  The ALJ based his decision on the testimony of the ME.  (Tr. at 30-31.)  The ALJ found Plaintiff's description of the extent of her limitations not credible given her conflicting testimony that she required the assistance of her mother to mop and dust, but was able to cook 2-3 times a week, grocery shop 2-3 times a week, and climb two flights of stairs each time she ran errands or went to a doctor's appointment.  (Tr. at 31-32.)  Further, the ALJ noted that there was no documentation in the record to show that Plaintiff participated in aggressive treatments for her alleged pain, or that the medications she was prescribed for the alleged pain were ineffective.  (Tr. at 31.)  Although the RFC findings of Plaintiff's treating physicians were largely consistent with the ME's testimony, the ALJ concluded that they were not controlling or entitled to significant weight because the limitation of Plaintiff to an 8-hour workday was inconsistent with other clinical and diagnostic findings in the record and the ME's testimony.  (Tr. at 32.)

The ALJ concluded that Plaintiff was capable of performing the past relevant work of an apartment manager because this work did not require the prohibited activities stipulated in her RFC.  (Tr. at 32, ¶6.)  Finally, because Plaintiff was able to perform the type of work she had done in the past, the ALJ concluded that she had not been disabled within the meaning of the Social Security

Act at any time from August 1, 2003 through the date of the decision.  (Tr. at 33.)

## II.  ANALYSIS

### A.   <u>Legal Standards</u>

#### 1.   **Standard of Review**

Judicial review of the Commissioner's denial of benefits is limited to whether the Commissioner's position is supported by substantial evidence and whether the Commissioner applied proper legal standards in evaluating the evidence.  42 U.S.C. § 405(g), 1383(C)(3); *Greenspan v. Shalala*, 38 F.3d 232, 236 (5th Cir. 1994).  Substantial evidence is defined as more than a scintilla, less than a preponderance, and as being such relevant and sufficient evidence as a reasonable mind might accept as adequate to support a conclusion. *Leggett v. Chater*, 67 F.3d 558, 564 (5th Cir. 1995).  In applying the substantial evidence standard, the reviewing court does not re-weigh the evidence, retry the issues, or substitute its own judgment, but rather, scrutinizes the record to determine whether substantial evidence is present.  *Greenspan*, 38 F.3d at 236.  A finding of no substantial evidence is appropriate only if there is a conspicuous absence of credible evidentiary choices or contrary medical findings to support the Commissioner's decision.  *Johnson v. Bowen*, 864 F.2d 340, 343-44 (5th Cir. 1988).

#### 2.   **Disability Determination**

To be entitled to social security benefits, a claimant must prove that he or she is disabled as defined by the Social Security Act. *Leggett*, 67 F.3d at 563–64; *Abshire v. Bowen*, 848 F.2d 638, 640 (5th Cir. 1988).  The definition of disability under the Social Security Act is "the inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected

to last for a continuous period of not less than 12 months."  42 U.S.C. § 423(d)(1)(A); *Anthony v.*

*Sullivan*, 954 F.2d 289, 292 (5th Cir. 1992).

The Commissioner utilizes a sequential five-step inquiry to determine whether a claimant is disabled:

1.  An individual who is working and engaging in substantial gainful activity will not be found disabled regardless of medical findings.

2.  An individual who does not have a "severe impairment" will not be found to be disabled.

3.  An individual who "meets or equals a listed impairment in Appendix 1" of the regulations will be considered disabled without consideration of vocational factors.

4.  If an individual is capable of performing the work he has done in the past, a finding of "not disabled" must be made.

5.  If an individual's impairment precludes him from performing his past work, other factors including age, education, past work experience, and residual functional capacity must be considered to determine if work can be performed.

*Wren v. Sullivan*, 925 F.2d 123, 125 (5th Cir. 1991) (summarizing 20 C.F.R. § 404.1520(b)-(f)).

Under the first four steps of the analysis, the burden lies with the claimant to prove disability.

*Leggett*, 67 F.3d at 564.  The analysis terminates if the Commissioner determines at any point during

the first four steps that the claimant is disabled or is not disabled.  *Id.*  Once the claimant satisfies

his or her burden under the first four steps, the burden shifts to the Commissioner at step five to

show that there is other gainful employment available in the national economy that the claimant is

capable of performing.  *Greenspan*, 38 F.3d at 236.  This burden may be satisfied either by reference

to the Medical-Vocational Guidelines of the regulations or by expert vocational testimony or other

similar evidence.  *Fraga v. Bowen*, 810 F.2d 1296, 1304 (5th Cir. 1987).  A finding that a claimant

is not disabled at any point in the five-step review is conclusive and terminates the analysis. *Lovelace v. Bowen*, 813 F.2d 55, 58 (5th Cir. 1987).

**B.      Issues for Review**

Plaintiff presents the following issues for review:

(1)      The ALJ failed to properly consider all of Plaintiff's impairments;

(2)      The ALJ improperly determined Plaintiff's Residual Functional Capacity; and

(3)      The ALJ erred in finding that Plaintiff could perform her past relevant work.

(Pl. Br. at 1).

**C.      Issue One: Plaintiff's Impairments**

Plaintiff contends that the ALJ erred in failing to consider all of her impairments in making his disability determination.  (Pl. Br. at 7.)  Plaintiff specifically argues that the ALJ failed to consider evidence of Plaintiff's mental impairment, i.e. her anxiety and depression, in evaluating the combined effects of all her impairments, and that the ALJ failed to consider the reported side effects of  Plaintiff's medications in making his disability determination.  (*Id.* at 7, 9.)  The Court will consider these issues separately.

**1.      Mental Impairment**

Plaintiff contends that the ALJ failed to consider evidence of her mental impairment although he was required to consider the combined effects of all her impairments.  (Pl. Br. at 7.)  Plaintiff argues that the ALJ's failure to consider her anxiety and depression resulted in an incomplete RFC assessment and consequently an erroneous finding of not disabled.  (Pl. Br. at 9.)

In making his disability determination, an ALJ is required to determine whether a claimant has "impairments" which, singly or in combination, are severe.  42 U.S.C. § 1382c.  "For Social

Security disability purposes, an 'impairment' is an abnormality that can be shown by medically acceptable clinical and laboratory diagnostic techniques, and in fact must be established by medical evidence as opposed to the claimant's subjective statement or symptoms. *Prince v. Barnhart*, 418 F. Supp. 2d 863, 867 (E.D. Tex. 2005) (citing 20 C.F.R. § 416.908). When determining whether a claimant's impairments are severe, an ALJ is required to consider the combined effects of all physical and mental impairments regardless of whether any impairment, considered alone, would be of sufficient severity. *Loza v. Apfel*, 219 F.3d 378, 393 (5th Cir. 2000) (citing 20 C.F.R. § 404.1523). If the ALJ does find a medically severe combination of impairments, "the combined impact of the impairments will be considered throughout the disability determination process." 20 C.F.R. § 404.1523.

In this case, Plaintiff's application for benefits claimed that she was disabled due to a number of impairments, including depression and anxiety. (Tr. at 144-45.) A Texas Worker's Compensation Commission report from 2003 noted that Plaintiff had a history of depression. (Tr. at 201.) Dr. Barbosa, Plaintiff's treating physician, also noted on different occasions that Plaintiff had a history of depression and anxiety, and that she was taking Prozac, Wellbutrin and Cymbalta to mitigate her symptoms. (Tr. at 318, 451-53.) Dr. Barbosa reported twice that Plaintiff's medication had helped improve her symptoms, but during other examinations noted that Plaintiff's symptoms of depression and anxiety had worsened, that her depression was a "major problem," that she suffered from "crying spells," and that she was becoming more anxious. (Tr. at 318, 473, 451-453). In fact, Plaintiff was diagnosed definitively with depression and anxiety not only by Dr. Barbosa, but another treating physician, Dr. Zodrow, who prescribed Prozac and Wellbutrin for her

- 16 -

symptoms.  (Tr. at 318, 247).  Dr. Zodrow also noted that Plaintiff's depression impaired her work

capacity.  (Tr. at 243-44).

Even though Plaintiff's subjective complaints of depression and anxiety were corroborated

by objective medical evidence on the record, the ALJ failed to include Plaintiff's depression and

anxiety as medical impairments, and consequently failed to consider the effect of these mental

impairments in combination with other impairments.  (Tr. at 27, ¶3.)  The ALJ was required to

consider the combined effects of all physical and mental impairments regardless of whether any

impairment, considered alone, was sufficiently severe.  *Loza*, 219 F.3d at 393.  Moreover, he was

required to consider the combined impact of the impairments throughout the disability determination

process.  20 C.F.R. § 404.1523.  In failing to consider the effect of Plaintiff's depression and anxiety

in compliance with 20 C.F.R. § 404.1523, the ALJ committed error.[5]

Violation of a regulation constitutes reversible error and requires remand only "when a

reviewing court concludes that the error is not harmless."  *Pearson v. Barnhart*, 2005 WL 1397049,

at *4 (E.D. Tex. May 23, 2005) (citing *Frank v. Barnhart*, 326 F.3d 618, 622 (5th Cir. 2003)).

Harmless error exists when it is inconceivable that a different administrative conclusion would have

been reached absent the error.  *Bornette v. Barnhart*, 466 F.Supp.2d 811, 816 (E.D. Tex. Nov. 28,

---

[5]Plaintiff also asserts that the ALJ erred in failing to follow the procedure outlined in 20 C.F.R. § 404.1520a(a) for evaluating the severity of mental impairments.  Under 20 C.F.R. § 404.1520a(a), if the ALJ concludes that a claimant has a medically determinable mental impairment, he must then rate the degree of functional limitation resulting from the impairment.  The degree of functional limitation is rated in four broad functional areas: activities of daily living; social functioning; concentration, persistence, or pace; and episodes of decompensation.  20 C.F.R. § 404.1520a(c)(3).  If the ALJ rates the degree of limitation in the first three functional areas as "none" or "mild" and "none" in the fourth area, the impairment will be found not severe, unless the evidence otherwise indicates that there is more than a minimal limitation in the ability to do basic work activities.  20 C.F.R. § 404.1520a(d)(1).  Failure to evaluate all alleged mental impairments in accordance with the procedures described in 20 C.F.R. § 404.1520a is reversible error.  *Satterwhite v. Barnhart*, 44 Fed. Appx. 652, 2002 WL 1396957, *1-2 ( 5th Cir. June 6, 2002); *see also Selassie v. Barnhart*, 203 Fed. Appx. 174, 176 (9th Cir. Oct 20, 2006); *Moore v. Barnhart*, 405 F.3d 1208, 1213-14 (11th Cir. 2005).  Because the ALJ did not consider whether Plaintiff had a medically determinable mental impairment, (*see* Tr. at 24-33), he did not consider its severity.

2006) (citing *Frank*, 326 F.3d at 622).  Since it is conceivable in this case that the violation of 20 C.F.R. § 404.1523 resulted in an improper RFC assessment by the ALJ and consequently an improper disability determination, the error is not harmless and remand is required on this issue.

Defendant contends that the ALJ properly considered Plaintiff's symptoms of depression and anxiety in conjunction with her fibromyalgia.  (Def. Br. at 4.)  The sole instance in which the ALJ referred to Plaintiff's depression and anxiety in conjunction with her fibromyalgia was in step 3 of the analysis.  (Tr. at 29.)  In doing so, he recited SSR 99-2 which states that "individuals with fibromyalgia may also exhibit medical signs, such as anxiety or depression, indicative of a medical disorder; and that when such medical signs are present and appropriately documented, the existence of a medically determinable impairment is established."  (Tr. at 29.)  After reciting this ruling, however, the ALJ declined to follow it by concluding that there was "no record of treatment of anxiety or depression by a mental health professional," even if Plaintiff was "likely depressed and anxious."  (Tr. at 30.)  As discussed earlier, there is ample evidence to suggest that Plaintiff was not only diagnosed but also treated for depression and anxiety by at least two medical professionals. Moreover, SSR 99-2p does not require treatment by a "mental health professional" in order for anxiety and depression to constitute a medically determinable impairment.

Defendant further argues that Plaintiff's failure to  allege a disabling mental impairment at the hearing prevents her from claiming one now.  (D. Br. at 5-6.)  Defendant relies on *Leggett v. Chater*, 67 F.3d 558 (5th Cir. 1995) in making this argument.  (D. Br. at 6.)  In *Leggett*, the social security claimant asserted that the ALJ's decision was erroneous because it failed to consider his alleged mental impairments.  67 F.3d at 566.  The Fifth Circuit stated that the ALJ had a duty to fully develop the record, but his duty to investigate did not extend to possible disabilities not alleged

- 18 -

by the claimant or not clearly indicated on the record.  *Id.*  The Court held that the claimant could not prevail on the mental impairment issue because he had raised it for the first time on his appeal to the Fifth Circuit.  *Id.*  Additionally, the record did not indicate that the claimant was treated for mental impairment symptoms.  *Id.*  This case is distinguishable from *Leggett* in that Plaintiff specifically claimed that she was disabled due to depression and anxiety among other things in her disability application.  (Tr. at 144-45.)  Also in contrast to *Leggett*, the record here indicates that Plaintiff was not only diagnosed definitively with depression and anxiety, but also treated for them when she was prescribed Prozac, Cymbalta, and Wellbutrin for her symptoms.  (Tr. at 318, 247, 473.)  Plaintiff's treatment by these anti-depressants was further evidence that Plaintiff had a potentially disabling mental impairment.  *Loza*, 219 F.3d at 397.

2.      **Medication Side Effects**

Plaintiff also argues that the ALJ failed to consider the side effects of her medications in making his disability determination.  (Pl. Br. at 9.)  Plaintiff contends that this failure resulted in an incomplete RFC assessment and ultimately an erroneous finding of "not disabled."  (Pl. Br. at 9.)

As part of his disability determination, the ALJ is required to consider "the type, dosage, effectiveness, and side effects of any medication" a claimant takes or has taken in order to alleviate his pain and other symptoms.  *Crowley v. Apfel*, 197 F.3d 194, 199 (5th Cir. 1999) (citing 20 C.F.R. §404.1529(c)(3)(iv)).  Consequently, when a claimant complains of medication side effects, and the ALJ fails to evaluate those side effects and their impact on the claimant's RFC, the ALJ commits error.  *See Brown v. Barnhart*, 285 F. Supp.2d 919, 935 (S.D. Tex. 2003).  Since the error involves violation of a regulation, reversal and remand is required only if the error is not harmless.  *Bornette* 466 F.Supp.2d at 816.  Harmless error exists when it is inconceivable that a different administrative

- 19 -

conclusion would have been reached absent the error. *Id.*

In this case, Plaintiff testified that she took four Vicodin daily for her pain, and a Klonopin, Sinemet and Soma every night to sleep. (Tr. at 480.) She also testified that the medication she took caused her to feel groggy and sleepy. *Id.* Plaintiff's subjective evidence was corroborated by the ME's objective testimony, in which the ME acknowledged that Plaintiff's medications could make her experience "excessive drowsiness" during the day. (Tr. at 493.) In making his RFC finding, the ALJ briefly mentioned Plaintiff's testimony that her medications "cause her to be drowsy." (Tr. at 31.) However, the ALJ did not evaluate her symptoms in light of the ME's objective testimony. *See id.* Nor did he provide any reasons for not finding Plaintiff's testimony concerning her side effects credible. *Id.* Since the ALJ's failure to properly evaluate the evidence in light of objective ME testimony conceivably resulted in an improper RFC assessment and an erroneous disability finding, it was not harmless and requires remand. *Bornette* 466 F.Supp.2d at 816.

For the reasons discussed above, the Court finds that the ALJ committed reversible error in failing to consider all of Plaintiff's impairments in making his disability determination. Since remand is required on this issue, the Court does not consider Plaintiff's other issues for review.

## III.   RECOMMENDATION

The Court recommends that Plaintiff's *Motion for Summary Judgment* be **GRANTED**, *Commissioner's Motion for Summary Judgment* be **DENIED**, and the decision of the Commissioner be **REVERSED** and **REMANDED** for further administrative proceedings.

**SO RECOMMENDED**, on this 27th day of August, 2009.

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

## INSTRUCTIONS FOR SERVICE AND
## NOTICE OF RIGHT TO APPEAL/OBJECT

  A copy of these findings, conclusions and recommendation shall be served on all parties in the manner provided by law.  Any party who objects to any part of these findings, conclusions and recommendation must file specific written objections within 10 days after being served with a copy.  *See* 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b).  In order to be specific, an objection must identify the specific finding or recommendation to which objection is made, state the basis for the objection, and specify the place in the magistrate judge's findings, conclusions and recommendation where the disputed determination is found.  An objection that merely incorporates by reference or refers to the briefing before the magistrate judge is not specific.  Failure to file specific written objections will bar the aggrieved party from appealing the factual findings and legal conclusions of the magistrate judge that are accepted or adopted by the district court, except upon grounds of plain error.  *See Douglass v. United Servs. Automobile Ass'n*, 79 F.3d 1415, 1417 (5th Cir. 1996).

IRMA CARRILLO RAMIREZ
UNITED STATES MAGISTRATE JUDGE

- 21 -